1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11    MOHAMED NAGIB HAMADA          )
      ABOUSHABAN,                   )
12                                  )     No. C 06-1280 BZ
                  Plaintiff(s),     )
13                                  )     **ORDER AWARDING**
           v.                       )     **PLAINTIFF FEES**
14                                  )
      ROBERT S. MUELLER, et al.,    )
15                                  )
                  Defendant(s).     )
16    _____)

17         On February 22, 2006, plaintiff filed a complaint seeking

18    a writ of mandamus directing the United States Citizenship and

19    Immigration Services (USCIS) and the Federal Bureau of

20    Investigation (FBI) to adjudicate plaintiff's pending I-485

21    application for adjustment of status to lawful permanent

22    resident.[1]  _See_ Aboushaban v. Mueller, 2006 WL 3041086, at *1

23    (N.D. Cal.).  A political asylee since January 22, 1997,

24    plaintiff alleged he filed his application on June 17, 1998.

25    _____

26         [1]    Plaintiff named Evelyn C. Upchurch, Acting Director,
      Nebraska Service Center, USCIS; Emilio T. Gonzalez, Director,
27    USCIS; Michael Chertoff, Secretary of the Dept. of Homeland
      Security; and Alberto Gonzales, Attorney General, Dept. of
      Justice.  I consider these defendants collectively as the
28    USCIS.

On October 24, 2006, I granted plaintiff's motion for summary judgment, ordered the USCIS to adjudicate plaintiff's application forthwith, and retained jurisdiction to ensure that my Order was carried out.  I also granted the FBI summary judgment because it had finished its limited role in the processing of plaintiff's application.  Id. at 2-3.  On November 6, 2006, the USCIS reported that it had approved plaintiff's application on October 27.  See Civil Docket No. 29.  Following agreement by the parties that no further relief was sought, final judgment was entered on February 21, 2007.[2]

Plaintiff has moved under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d), for an award of $46,616.06 in attorney's fees and costs incurred in these proceedings.

To obtain fees under the EAJA, a party must demonstrate: 1) that he attained "prevailing party" status in the underlying action; 2) that the government's position was not "substantially justified"; and 3) that no "special circumstances [make] an award unjust."[3]  See In re Application of Mgndichian, 312 F. Supp. 2d 1250, 1255 (C.D. Cal. 2003)

---

[2]    Initially, defendants argued that plaintiff's fee application was premature.  At a February 21, 2007 hearing, however, defendants concurred in the issuance of the final judgment and waived their procedural objection.  Plaintiff's motion is therefore ripe for decision.

[3]    In addition, the movant must demonstrate that he was a party to the underlying action; that the action was civil; and that his net worth did not exceed two million at the time the action was filed.  See 28 U.S.C.A. § 2412.  Here, the first two elements are clearly met, and plaintiff avers in a declaration that his net worth did not exceed two million dollars at the time of filing.  See Declaration of Mohamed Aboushaban's ¶ 1.  Defendants do not dispute these elements, and I conclude that they are met.

1   (citing I.N.S. v. Jean, 496 U.S. 154, 158 (1990)).

2        To prevail, the party must "succeed on any significant

3   issue in litigation which achieves some of the benefit the

4   part[y] sought in bringing suit." U.S. v. Real Property Known

5   as 22249 Dolorosa Street, Woodland Hills, Cal., 190 F.3d 977,

6   981 (9th Cir. 1999) (internal quotation marks omitted)).  The

7   success must be "gained by judgment or consent decree

8   [affecting] a material alteration of the legal relationship of

9   the parties." See Perez-Arellano v. Smith, 279 F.3d 791, 793-

10  94 (9th Cir. 2002) (internal quotation omitted) (applying

11  Buckhannon Board & Care Home, Inc. v. West Virginia Department

12  of Health & Human Resources, 532 U.S. 598 (2001), which

13  rejected the "catalyst theory," under which a party gained

14  prevailing status if he achieved a desired result through

15  voluntary changes brought on by the party's lawsuit, to EAJA

16  applications).

17       Defendants argue that plaintiff did not prevail because

18  the USCIS voluntarily agreed to adjudicate plaintiff's

19  application once he submitted a replacement Supplemental Form

20  (Documentation of Immunization) to the Medical Examination

21  Form I-693 (hereinafter "Supplemental Form").  At that point,

22  defendants assert, plaintiff's claim was moot.  Thus, this

23  Court's Order was unnecessary and could not have conveyed

24  prevailing party status to plaintiff.  I disagree.

25       First, my ruling constitutes a binding judgment that

26  altered the legal relationship between the parties in exactly

27  the manner requested by plaintiff.  Plaintiff sought and

28  received an order requiring defendants to adjudicate his

3

1    application in a timely fashion.  Plaintiff could have moved

2    to enforce my Order if defendants had failed to act.  An order

3    of this kind serves to convey prevailing status.  *See*

4    Carbonell v. I.N.S., 429 F.3d 894, 900-01 (9th Cir. 2005)

5    (party who obtained court order incorporating stipulation

6    staying deportation prevailed); Rueda-Menicucci, 132 F.3d 493,

7    495 (9th Cir. 1997) (order remanding asylum application for

8    further consideration conferred prevailing status); Salem v.

9    I.N.S., 122 F. Supp. 2d 980, 983-84 (C.D. Ill. 2000) (same);

10   Bates v. Nicholson, 20 Vet.App. 185, 188-90 (2006) (issuance

11   of writ of mandamus compelling administrative review conferred

12   prevailing status); *see also* Dabone v. Thornburgh, 734 F.Supp.

13   195, 198 (E.D. Penn. 1990) (party prevailed in mandamus action

14   resulting in reopening of exclusion proceedings); Jefrey v.

15   I.N.S., 710 F.Supp. 486, 488 (S.D.N.Y. 1989) (party prevailed

16   in mandamus action resulting in swift adjudication of

17   application); Achaval-Bianco v. Gustafson, 736 F.Supp. 214,

18   215 (C.D. Cal. 1989) (same).

19       Second, the defendants' eleventh-hour promise to

20   adjudicate plaintiff's application did not serve to negate the

21   necessity of my Order or somehow remove the judicial

22   imprimatur thereof.  Defendants did inform plaintiff on

23   September 18, 2006, that his application would be processed

24   upon submission of a completed Supplemental Form.[4]  *See* Defs.'

25   Sur-Reply to Pl's Mot. for Att'y Fees, Decl. of Mark Johnson ¶

26

27       [4]    As explained in more detail below, however, the
     USCIS already had in its files a completed Supplemental Form.
28   The form, however, had been misfiled.  *See* Johnson Decl. ¶ 4.

4

1    3.  By that time, however, plaintiff had waited eight years

2    for his application to be processed.  Inasmuch as plaintiff

3    had already submitted one such completed form, and in light of

4    defendants' extended delay, it is not surprising that

5    plaintiff wanted to press forward.  Since the motion

6    culminated in a hearing and an order in plaintiff's favor, for

7    purposes of EAJA, plaintiff is a prevailing party in the

8    underlying proceeding.

9         Once the movant demonstrates prevailing party status, the

10   government bears the burden of proving that its positions were

11   "substantially justified."  <u>See</u> <u>Thangaraja v. Gonzales</u>, 428

12   F.3d 870, 874 (9th Cir. 2005).  Whether a position is

13   substantially justified depends on whether it has a

14   "'reasonable basis in both law and fact.'"  <u>Abela v.</u>

15   <u>Gustafson</u>, 888 F.2d 1258, 1264 (9th Cir. 1989) (quoting <u>Pierce</u>

16   <u>v. Underwood</u>, 487 U.S. 552, 565 (1988)).  "'Substantial

17   justification in this context means justification to a degree

18   that could satisfy a reasonable person.'"  <u>Thangaraja</u>, 428

19   F.3d at 874 (quoting <u>Al- Harbi v. I.N.S.</u>, 284 F.3d 1080, 1085

20   (9th Cir. 2002)).  A position can be justified even if it is

21   not correct.  <u>See</u> <u>In re Application of Mandichian</u>, 312 F.

22   Supp. 2d at 1261 (quotation marks and citations omitted).  In

23   making this determination, however, the court must examine

24   "both the government's litigation position and 'the action or

25   failure to act by the agency upon which the civil action is

26   based.'"  <u>Abela v. Gustafson</u>, 888 F.2d at 1264 (citing 28

27   U.S.C. § 2412(d)(2)(D)); <u>see also</u> <u>Thangaraja</u>, 428 F.3d at 873.

28        I find that several aspects of defendants' pre-litigation

conduct lacked substantial justification.  In attempting to

explain the years of delay experienced by plaintiff,

defendants rely primarily on the fact that the law prior to

May 11, 2005 forbade the Attorney General from making more

than 10,000 permanent resident visas available in a given

fiscal year.[5]  *See* 8 U.S.C. § 1159(b) (2005).  They claim that

the number of asylees seeking permanent status ballooned in

the years in question, leading to a backlog of over 150,000 by

September 1, 2003, and of over 160,000 by March 1, 2004.  *See*

Keller Decl. ¶¶ 4, 2.  Because the asylum-based adjustment

backlog was considered in date-received order according to a

list kept by the USCIS, *see* 8 C.F.R. § 209.2(a)(1), defendants

assert that plaintiff's application was processed in due time.

Accepting defendants' claims about the backlog, it is

still not clear why plaintiff's application, filed in mid-

1998, remained pending for as long as it did.  For example,

defendants do not discuss how extensive the backlog was in

1998, 1999, 2000, 2001, or 2002.  Nor do they explain where

plaintiff's application fit into the USCIS's processing queue.

Given that applications were to be processed in the order

received, knowing that by 2003 there was a large backlog does

not explain why plaintiff's application was not processed

until 2006.  Moreover, just because the Attorney General could

make no more than 10,000 visa number available in a given

fiscal year does not mean that the USCIS could not process

---

[5]   Issuance of the visa numbers is the method by which the Attorney General makes adjustment to permanent status available.  *See* Keller Decl. ¶¶ 2-4.

1    more than 10,000 applications in a year.  The restriction on

2    processing seems to have been an internal decision.  Keller

3    Decl. ¶3.  Finally, the continued delay after the visa number

4    restraint was lifted May 11, 2005, is never explained.

5         A more fundamental problem for defendants is that it

6    appears that plaintiff's application was delayed by

7    defendants' practice of "hiring" the FBI to perform a

8    background or name check on applicants.  _See_ Pl.'s Reply to

9    Defs.' Opp. to EAJA Mot., Exh. 7 (Annual Report to Congress,

10   Citizenship and Immigration Services Ombudsman, June 2006), at

11   24 ("the name checks are a fee-for-service that the FBI

12   provides the USCIS at its request.").  The USCIS requested an

13   FBI name check on December 3, 2002.  Keller Decl. ¶ 6.  Over

14   the ensuing four years, processing of plaintiff's application

15   was largely confined to transferring it from one office to

16   another.[6]  It was not until the FBI finished its name check in

17   April 2006 - two months after plaintiff filed the underlying

18   action - that the USCIS took decisive action to finally

19   adjudicate the application.  _See_ Keller Decl. ¶¶ 9-10; Johnson

20   Decl. ¶ 2.  Despite the clear connection between the

21   processing of the name check and USCIS's final adjudication,

22   defendants do not explain why the name check was so delayed.[7]

23   _____

24        [6]   The USCIS did request an additional Supplemental Form
     to plaintiff's Form I-693 on December 10, 2002.  Keller Decl. ¶
25   7.  Besides that, most activity on plaintiff's application was
     elicited by inquiries from his attorneys.  _Cf._ _id._ at ¶¶ 7-10
26   _with_ Pl.'s Reply to Defs.' Opp'n, Exh. 1 & 3.

27        [7]   At the February 21 hearing, defendants argued that
     granting summary judgment for the FBI in the underlying case
28   precludes me from holding the USCIS accountable for the FBI's
     delays.  The defendants also correctly argued that it is not

1    Defendants also seek to blame plaintiff for the delay.

2    Defendants claim that plaintiff filed a deficient Supplemental

3    Form with his application, precluding processing of the

4    application.  And while defendants admit that they

5    subsequently misfiled a later-filed corrected form, they opine

6    that plaintiff compounded the problem by failing to inform

7    them in September 2006 that a more recent and complete

8    Supplemental Form existed.

9    Plaintiff's original Supplemental Form did contain

10   deficiencies.  Plaintiff, however, was not informed of them

11   until December 10, 2002.  Keller Decl. ¶ 7.  Thus, the delay

12   from 1998 through 2002 cannot entirely be put on plaintiff.

13   In response to the USCIS's request for a corrected form,

14   plaintiff promptly mailed one in February 2003.  _See_ Pl.'s

15   Reply to Defs.' Opp'n, Exh. 12; _see also_ _id._ at Exh. 10 (Decl.

16   of Philip Hornik ¶¶ 3, 10).  It is now undisputed that this

17   form corrected the initial deficiencies.[8]  The USCIS, however,

18   _____

19   this court's role to tell the FBI how to conduct background
     checks.  It is, however, for this court to determine that four

20   years of unexplained delay occasioned by the name check process
     is not substantially justified.  Insofar as the FBI was acting

21   at the request of the USCIS, and the USCIS knew of the delays
     inherent in the FBI's processes, it cannot now claim that it

22   should not be held responsible for such delays.  I find the
     FBI's delays attributable to the USCIS.  _See, e.g._, Shalan v.

23   Chertoff, 2006 WL 3307512, at *2 (D. Mass.) (rejecting the
     argument that delay occasioned by the FBI may render the

24   USCIS's position substantially justified); Singh v. Still, ---
     F. Supp. 2d---, 2006 WL 3898174, at *3 (N.D. Cal.) (rejecting

25   the government respondents' attempts to "divorce themselves"
     from the FBI's name check processes).

26   [8]    Throughout this litigation, the USCIS had maintained
     the position that the second Supplemental Form contained the

27   same deficiencies as the first, and that plaintiff's repeated
     error partially explained the delays he experienced.  It was

28   not until I ordered defendants to file a sur-reply clarifying

8

1    misfiled the form.  Johnson Decl. ¶ 4.  Due to this error,

2    plaintiff was made to complete a third form, which he did in

3    October 2006.  Pl.'s Reply to Defs.' Opp'n, at Exh. 15 & 16.

4    Even if the misfiling was an innocent bureaucratic mistake,[9]

5    plaintiff was not informed of the need for a third form until

6    September 15, 2006.  Johnson Decl. ¶ 2.  The delay from

7    February 2003 through September 2006 cannot rightly be put on

8    plaintiff.

9        The deficiencies in plaintiff's application can only

10   explain perhaps several months of the years of inaction and

11   delay on the application.  The FBI's delay in processing

12   plaintiff's name check remains largely unexplained, and the

13   remainder of defendants' arguments do not adequately excuse

14   the delays plaintiff encountered.[10]  Like a number of courts

15   before me, I cannot conclude that a reasonable person would

16   _____

17   the deficiencies with the second form that defendants admitted
     to having misplaced the second, deficiency-free form.

18       [9]   The argument that plaintiff and his counsel are to
     blame for not telling Officer Johnson of the presence of the
19   more recent, deficiency-free form lacks substance.  Johnson
     does not claim to have shown the deficient form to plaintiff or
20   to have otherwise identified it.  Thus, there is no way
     plaintiff could have known that Johnson was missing the second
21   form and was actually referring to the first form during the
     interview.
22

23       [10]   In addition to the problems already discussed,
     plaintiff may have experienced additional delay stemming from
24   an apparent misclassification of his application.  In March
     2005 the USCIS mistakenly characterized plaintiff's application
25   as having been filed in March 2002.  *See* Pl.'s Reply to Defs.'
     Opp'n, Exh. 3.  This filing date put plaintiff's application on
26   track to be adjudicated sometime between October 2009 and
     September 2010.  Although plaintiff's counsel promptly informed
27   the USCIS of the mistake, it is unclear how long the
     application has been misclassified or what impact it had on the
28   pace of adjudication.  Suffice it to say that this error does
     not support the defendants' claim that the delay was justified.

find the delays experienced by plaintiff reasonable.  _See, e.g._, _Abela_, 888 F.2d at 1266 (delays forcing plaintiffs to seek relief in district court were not justified); _Shalan v. Chertoff_, 2006 WL 3307512, at *2 (D. Mass.) (undue delay "renders the government's pre-litigation position not 'substantially justified'"); _Salem_, 122 F. Supp. 2d at 985 (undue delay was not substantially justified); _Dabone_, 734 F. Supp. at 203 (assertion of overwork did not justify delay). Defendants have failed to meet their burden of demonstrating that the delay in processing plaintiff's was substantially justified.

Nor were the defendants' litigation positions substantially justified.  As plaintiff points out, defendants asserted that they had no ministerial duty to adjudicate plaintiff's application within a specified period.  _See_ Civil Docket No. 23 (Def's Opp'n to Pl.'s Mot. for Sum. J.), at 3. While the pertinent statutes do not specify a time within which an application must be processed, the clear trend of the law is to recognize that the government has a duty to process these and similar applications within a reasonable period of time.  _See_ _Aboushaban_, 2006 WL 3041086, at *2 (discussing these duties).  Considering the nature and length of the delay, defendants' position was not justified.

The facts of plaintiff's case render defendants' position even less tenable.  In their opposition to summary judgment, the defendants' only explanation for the nearly eight year delay was that plaintiff had yet to turn in his Supplemental Form to the Form I-693.  As discussed, this explanation

1   addresses a small portion of the delay plaintiff experienced.

2   Defendants' current arguments do not adequately justify these

3   seven years of delay compelling a finding that the defendants'

4   litigation positions were not substantially justified in law

5   and fact.

6       Finally, there is the question of whether "special

7   circumstances" exist that would make an award of attorney's

8   fees unjust.  *See* 28 U.S.C. § 2412(d)(1)(A).  Defendants do

9   not raise any circumstances, and I can divine none, that would

10  make an award in this case unjust.

11      I conclude that plaintiff prevailed in the underlying

12  action and that the defendants' pre-litigation conduct and

13  litigation positions were not substantially justified.  Having

14  met the other statutory requirements, and there being no

15  special circumstances to render an award unjust, plaintiff is

16  entitled to an award of reasonable attorney's fees and costs

17  under the EAJA.

18      EAJA provides that attorney's fees shall not be awarded

19  in excess of $125 per hour unless the court determines that an

20  increase in the cost of living or some special factor, such as

21  the limited availability of qualified attorneys for the

22  proceedings involved, justifies a higher fee.  28 U.S.C. §

23  2412(d)(2)(A).  Defendants agree that, should plaintiff be

24  awarded attorney's fees, he should be awarded the statutory

25  rate adjusted for inflation, $171.03 per hour.[11]

26  _____

27      [11]   In his own calculations, plaintiff used the Consumer
    Price Index for All Urban Consumers (CPI-U) rate for October
    2006 (211).  However, since the time plaintiff made his
28  calculations, the aggregate CPI-U rate for the year 2006 was

1    Plaintiff, however, requests an increased rate of $350

2  per hour.  He argues that his counsel possesses special

3  expertise required for the successful completion of the

4  instant litigation, and that it would have been nearly

5  impossible to find an attorney to take his case at the

6  statutory rate.  Defendants assert in part that the requested

7  rate is excessive insofar as no specialized skill or knowledge

8  was required to litigate this case.  Defs. Opp'n to Pl.'s Mot.

9  for Att'y Fees, at *8.

10    The EAJA attorney fee rate cap may be exceeded if three

11  requirements are satisfied: 1) the attorney has "distinctive

12  knowledge or specialized skill"; 2) such knowledge and skills

13  were necessary for the litigation; and 3) similar knowledge

14  and skills could not have been obtained at the statutory rate.

15  See Love v. Reilly, 924 F 2d 1492,1496 (9th Cir. 1991); Pirus

16  v. Bowen, 869 F.2d 536, 541-42 (9th Cir. 1989); Lucas v.

17  White, 63 F. Supp. 2d 1046, 1061 (N.D. Cal. 1999).

18    Although plaintiff's counsel possesses substantial

19  experience in immigration matters, and although such matters

20  may indeed be complex, see Castro v. O'Ryan v. I.N.S., 847

21  F.2d 1307, 1312 (9th Cir. 1987), defendants are correct that

22  this matter did not demand specialized or distinctive

23  knowledge or skill.  The underlying dispute was a relatively

24  straight-forward mandamus action requiring no discovery or

25  _____

26  announced as 209.2.  See http://data/bls.gov/cgi-
    bin/surveymost.  The $171.03 per hour rate utilizes the 209.2
27  annual rate.  Additionally, I note that the Bureau of Labor
    Statistics has not yet announced CPI-U rates for 2007.  Thus,
28  while some hours were accrued in 2007, I apply the $171.03 rate
    to all hours billed.

1    evidentiary hearings.  Indeed, the summary judgment motion was

2    resolved largely on the basis of a two-page stipulated joint

3    statement of facts.  And while the defendants mounted a

4    spirited defense, plaintiff's filings were relatively concise

5    and did not involve unusually difficult questions of law.[12]

6    The adjusted statutory rate of $171.03 per hour provides

7    adequate compensation.  _See_ 28 U.S.C. § 2412(d)(2)(A).

8        Finally, defendants contend that the hours Mr. Steinberg

9    claims for preparing the EAJA request should be cut in half

10   because the time claimed is disproportionate to the time spent

11   on the merits of the underlying claim.[13]  Although the tasks

12   documented in the billing records generally seem reasonable

13   and necessary to the successful adjudication of the

14   plaintiff's EAJA motion, I agree that plaintiff's request must

15   be reduced.

16       "[F]ees for fee litigation should be excluded to the

17   extent that the applicant ultimately fails to prevail in such

18

19   [12]   The cases plaintiff relies on are distinguishable.
     Nadler v. I.N.S., 737 F. Supp. 658 (D.D.C. 1989), for example,
20   involved a more complicated procedural history and fairly
     complex legal questions concerning whether a decision by an INS
21   district director to deny an application and certify it for
     review may moot a contemporaneous civil action.  Douglas v.
22   Baker, 809 F. Supp. 131 (D.D.C. 1992), involved difficult
     issues of fact and credibility going to whether embassy
23   officials properly denied passports to certain individuals.
     Insofar as plaintiff proffers cases involving class action
24   proceedings, those cases are obviously inapposite.  _See_ Decl.
     of Robert H. Gibbs ¶ 4.  A review of the docket of the one case
25   plaintiff cites out of this district, Chintakuntla, et al., v.
     I.N.S., No. 99-5211 MMC (MEJ) (N.D. Cal. 2002), demonstrates
26   that it involved a putative class action and is likewise
     distinguishable.

27   [13]   Defendant does not dispute the 75.2 hours plaintiff
     billed for time spent on the merits of the case.  _See_ Defs.'
28   Opp'n to Pl.'s Mot. for Att'y Fees, at 9.

litigation." <u>Commissioner, I.N.S. v. Jean</u>, 496 U.S. 154, 163
n.10 (1990); <u>see also</u> <u>Nat'l Veterans Legal Services Program v.</u>
<u>U.S. Dept. of Veterans Affairs</u>, 1999 WL 33740260, at *5-*6
(D.D.C.) (applying <u>Jean</u> and noting that an overall award
should be reduced by the amount of time spent unsuccessfully
defending hours eliminated by the court).  Here, plaintiff
unsuccessfully moved for an increased rate of $350 per hour.
I estimate that approximately one-third of the 56 hours
claimed for plaintiff's fees litigation relate to this failed
request.[14]  Accordingly, I find that plaintiff's attorney
reasonably expended 37.33 hours in litigating the motion for
attorney's fees.

In addition, my independent review of plaintiff's request
leads me to discount five hours of paralegal work claimed.[15]
Plaintiff is not permitted to claim the attorney fees rate for
work of this nature.[16]  <u>*See, e.g.,*</u> <u>In re Application of</u>

---

[14]   Counsel's time records do not permit a more precise
breakdown.

[15]   <u>See</u> Pl.'s Request for Att'y Fees, Exh. 6. (2/27/06,
.1 hr for Email to this Court; 2/28/06, .1 hr Requested ADR
Handbook; 3/01/06, Received Notices; 3/10/06, .7 hr Proof of
Service; 6/13/06; .1 hr Reviewed Rescheduling Order; 7/05/06,
.1 hr Received ADR notice; 7/10/06, .1 hr Received Draft;
7/17/06, .1 hr Received Notice; 7/25/06, .1 hr Reviewed Civil
Minute Order; 7/26/06 .1 hr Reviewed Scheduling Order; 9/1/06,
.5 hr prepared CD; 9/20/06, .1 hr Received document; 9/21/06,
.1 Received document; 10/4/06, .5 Prepared CD; 12/19/06, 2 of 3
hrs Figuring the CPI-U).

[16]   At the February 21 hearing, plaintiff's attorney
suggested that the five hours be compensated at $90 per hour.
The movant, however, has some burden to demonstrate the
reasonableness of the requested award.  <u>See</u> <u>Lucas v. White</u>, 63
F.Supp.2d 1046, 1057 (N.D. Cal. 1999) (citing <u>Gates v.</u>
<u>Deukmejian</u>, 987 F.2d 1392, 1397 (9th Cir. 1992) (noting that a
movant must adequately document the hours billed).  Plaintiff
provided no authority for the proposition that $90 per hour is

14

1    <u>Mqnidichian</u>, 312 F. Supp. 2d at 1266 (distinguishing between

2    paralegal work product and attorney work product).   In total,

3    I find that plaintiff's attorney reasonably billed 107.53

4    hours in litigating this case.

5         Plaintiff also seeks the recovery of $696.06 in costs.

6    Reasonable costs of any project that is necessary for the

7    preparation of a party's case may be recovered under the EAJA.

8    <u>See</u> 28 U.S.C. §2412(d)(2)(A).  Plaintiff supplied a detailed

9    account of the costs incurred.  <u>See</u> Pl.'s Request for Att'y

10   Fees, Exh. 6; Pl.'s Reply to Defs.' Opp. to EAJA Mot, Exh. 17;

11   Pl.'s Updated Att'y Time Record.  I find these costs necessary

12   for the preparation of the action and accordingly award him

13   the full amount of costs requested, $696.06.

14        For the foregoing reasons, plaintiff's motion for

15   attorney fees and costs is **GRANTED IN PART** as follows:

16   Plaintiff is awarded a total of **$19,086.92** in attorney's fees

17   and costs.  The total award includes $18,390.86 in attorney's

18   fees (107.53 hours of attorney work multiplied by the adjusted

19   statutory rate of $171.03 per hour) and $696.06 in costs.

20   Dated: February 23, 2007

21

22                        Bernard Zimmerman
                          United States Magistrate Judge

23

24

25   G:\BZALL\~BZCASES\ABOUSHABAN\ORDER.ATT.FEE.BZ VERSION.2.wpd

26

27   an appropriate rate to bill for paralegal work.  Nor did
     plaintiff state the rate at which these hours were actually
28   billed.